J-S18017-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: N.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1319 WDA 2023 |

Appeal from the Order Entered October 3, 2023
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000180-2022

BEFORE: PANELLA, P.J.E., McLAUGHLIN, J., and SULLIVAN, J.

MEMORANDUM BY McLAUGHLIN, J.: **FILED: July 29, 2024**

N.S. ("Father") appeals from the order terminating his parental rights to his child, D.S. ("Child"). We affirm.

Father and F.F. ("Mother") previously resided in Fayette County. Mother gave birth to Child in March 2020, after the family moved from Fayette County to Allegheny County. The day after Child was born, at the request of Fayette County Children and Youth Services ("CYS"), the Fayette County Court of Common Pleas ordered Child to be placed with Foster Parents, who were already caring for Child's brother. Child has resided with Foster Parents since her discharge from the hospital.

Due to Mother and Father's relocation to Allegheny County, the Fayette County court transferred Child's dependency case to Allegheny County. The Allegheny Court of Common Pleas adjudicated Child dependent in November 2020. In November 2022, the court found aggravated circumstances existed

because Mother's and Father's parental rights to four other children have been involuntarily terminated.

Over two years after Child was adjudicated dependent, in December 2022, the Allegheny County Office of Children Youth and Families ("OCYF") filed petitions for the involuntary termination of Mother's and Father's parental rights to Child.

The court held a hearing on the petitions on September 8, 12, and 26, 2023. It heard the testimony of Fayette County Adult Probation Officer Michael Fell; the court-appointed psychologist, Dr. Terry O'Hara; Program Manager for the Auberle Emergency Family Shelter, Krislynn Jones; Case Manager for Allegheny Valley Association of Churches, Kelli Sembower; OCYF caseworker, Donna Colella; Foster Care Case Manager, Catherine Kintz; Mother; and Father.

The OCYF caseworker, Donna Colella, testified that CYF has been involved with the family on-and-off since 2015. N.T., 9/8/23, at 116. Mother and Father stipulated that in 2016, CYS received a report that some children had missed medical appointments, including an MRI. Findings of Fact, Oct. 24, 2023, at 3. In 2017, CYS received a report that Father was acting strangely during the birth of another child. *Id.*

In 2018, EMS responded to the family's home and found one of Child's siblings on the floor and unresponsive due to dehydration and malnutrition. *Id.* at 2; N.T. at 116. The sibling was 22 months old at the time and weighed just over 15 pounds. *See* OCYF Ex. #10, Order of Adjudication and

Disposition, 11/18/20, at ¶ 7. Neither parent had an explanation for the sibling's condition. *Id.*

The incident resulted in criminal charges against Mother and Father. N.T. at 25. In May 2021, Mother pleaded guilty to simple assault and related charges, and was sentenced to 36 months of probation and 18 months of electric home monitoring. *Id.* at 6. Father pleaded guilty to simple assault and related charges and was sentenced to 36 months of probation and 18 months of electric home monitoring. *Id.* at 159; OCYF Ex. 9. The incident also led CYF to move to terminate Mother's and Father's parental rights to Child's five older siblings. N.T. at 116. Termination was granted in 2022 as to four children. *Id.* at 117. The incident also led CYF to remove Child following her birth in 2020, for fear for her safety. *Id.* at 168.

When interviewed by the court-appointed psychologist, Dr. O'Hara, Father denied any responsibility for the incident. *Id.* at 28-29. Father claimed Child had been poisoned by inhaling hydrocarbon after a heater had spilled and kerosene had seeped into the wood floors. *Id.*; *see also id.* at 70. When Dr. O'Hara asked Mother about the incident, Mother did not respond. *Id.* at 25. Regarding the parents' refusal to take responsibility, Dr. O'Hara stated,

> I think it's problematic. This is a case where [Mother] pled guilty to criminal offenses in relation to this child. So there was already a criminal case that she accepted responsibility in that sense. But without working with services to address the issue that influenced the chronic malnutrition for the child in the first place, it's really difficult for parties to make substantive charges and to create an environment where the issue wouldn't be recurrent.

*Id.* at 25-26; *see also id.* at 70-71.

Both Colella and Dr. O'Hara also testified regarding intimate partner violence ("IPV") in the household. Due to reports of violence between the parties, OCYF referred both parents for IPV treatment. *Id.* at 119. Colella testified that Mother completed an initial IPV course in August 2021. *Id.* at 150-51. However, there continued to be incidents of IPV between Mother and Father. *Id.* at 154. Mother obtained a PFA against Father, which she later "dropped." *Id.* at 9. OCYF referred Mother to a second round of treatment, which Mother completed in February 2022. *Id.* at 154. Father also completed an IPV course in 2022. *Id.* at 161. Nevertheless, the violence persisted, with Mother still reporting abuse in July 2023. *Id.* at 88-89, 144-45. The most recent reports of abuse resulted in Father being terminated from the housing program. *Id.* at 89. OCYF requested Mother and Father continue IPV treatment. *Id.* at 151, 161. Both parents refused. *Id.* at 146, 154, 161-62.

Dr. O'Hara testified that exposure to violence is an adverse childhood experience. *Id.* at 21. He stated that such experiences place children at greater risk "of mental health issues, substance abuse concerns, even greater likelihood of having medical issues as well." *Id.* He testified, "children who are exposed to violence, as I said, have -- are typically behind the starting line when given the nature of the effects, the long-lasting effects of adverse childhood experiences." *Id.* at 44.

In Dr. O'Hara's psychological evaluation, he stated the parents have not made any progress towards resolving the IPV, in part due to their lack of accountability:

> This examiner does not have evidence that [Mother] and/or [Father] have made meaningful gains in their respective IPV interventions, and both parties continue to minimize the IPV involving them. Further, this examiner does not have evidence that [Mother] would be able to extricate herself from ongoing IPV with [Father] and exposure to IPV is an adverse childhood experience. According to the research, there is significant overlap of child abuse in households where IPV exists. This examiner is extremely concerned with the lack of accountability and responsibility by both parties in relation to their criminal activity, which involved one of their children, and their rights to several children being terminated.

OCYF Ex. 11, Psychological Evaluation Report, submitted 11/27/22, at 36.[1] He also stated his concern that Child would be at risk of exposure if returned to her parents, due to their failure to confront the issue:

> This examiner lacks evidence that [Mother] and [Father] are in a position to appropriately care for [Child's] needs and welfare and this is extremely concerning given the amount of time that [Child] has been out of parental care. This examiner does not have evidence that historical IPV concerns have been sufficiently addressed by the parties and, in this examiner's opinion, [Child] would be at risk of potential exposure to IPV if she were to have unsupervised contact with her parents at this time. This examiner strongly advises against unsupervised contact for [Child] with her parents. Further, this examiner does not have evidence that [Father] and/or [Mother] are desiring to make substantive changes or meaningfully work with providers, especially with respect to IPV, as both parties continue to downplay their history of IPV.

---

[1] We need not review the full testimony offered at the hearing.

OCYF Ex. 11, Psychological Evaluation Report, submitted 8/24/23, at 31. Regarding whether termination of parental rights would have a negative effect on Child, he stated, "There may be some detriment to [Child], if her relationships with her parents were severed, yet this detriment should be weighed against risk of exposure to IPV, which is an adverse childhood experience, reported inconsistent visitation, and her strong relationships with her foster parents." *Id.* at 32. He also testified to a Child's need for stability,

> permanency is of significant concern for a child of [Child]'s age. There's a lot of research on how children do with their foundational bedrock of safety, stability and security as opposed to children that lack this foundation.

N.T. at 44.

Following the hearing, the court issued its Findings of Fact. The court found that the parents had failed to eliminate abuse from their relationship. Findings of Fact, Oct. 24, 2023, at 5. It stated that Mother "continues to downplay or minimize the intimate partner violence," and noted that Father denies the need for services. *Id.* at 7. The court also noted that the parties refuse further services. The court recalled that Dr. O'Hara, had "testified about the negative effects that growing up in a home with intimate partner violence can have upon the development of young children." *Id.*[2]

---

[2] The court also noted the parents' inability to maintain stable housing. The court observed that Mother and Father have been living in a homeless shelter and now live in a hotel acting as an overflow shelter. However, the court found that this issue alone would not warrant termination of parental rights.

Regarding Child's best interests, the court observed that Child has been with Foster Parents and her older sibling since birth, and that there have been a lot of disruptions to parents' visitation schedule. The court also credited Dr. O'Hara's testimony that "IPV concerns have not been sufficiently addressed by the parties and, in his opinion, [Child] would be at risk of potential exposure to IPV if she were to have unsupervised contact with her parents at this time." *Id.* at 9. The court concluded,

> I concur with Dr. O'Hara's opinion that termination of parental rights, best serve[s] the needs and welfare of [Child]. [Child] is placed with her brother in a loving foster home, where she has lived her entire life. Her primary bond is with her foster parents, with whom she has resided for her entire life. Mother and Father have not addressed the serious issue of intimate partner violence in their home, which would place [Child] at risk (as well as the Children that are currently in their care). [Child] deserves to remain in this environment on a permanent basis, which can only happen through the termination of parental rights.

*Id.* at 10.

The court found clear and convincing evidence established grounds for termination under 23 Pa.C.S.A. § 2511(a)(5) and (a)(8) and § 2511(b). The court issued an order involuntarily terminating Mother's and Father's parental rights to Child. Father appealed.[3]

Father raises the following issues:

> 1. Did the trial court err and/or abuse its discretion by finding that the Office of Children, Youth, & Families established by clear and

---

[3] Mother's appeal is addressed in a companion case. *See* No. 1301 WDA 2023.

convincing evidence that grounds exist to terminate the parental rights of Father under 23 Pa. C.S. § 2511(a)(5), and (8).

2. Did the trial court err and/or abuse its discretion by finding that the Office of Children, Youth, & Families established by clear and convincing evidence that the termination of Father's parental rights served the needs and welfare of the minor child pursuant to 23 Pa. C.S. § 2511(b).

Father's Br. at 6 (trial court answers omitted).

Father first argues that OCYF did not meet its burden under 2511(a). He argues Child was not removed due to IPV, and there is no evidence that she was ever abused. He also contends he completed IPV treatment successfully, and claims, "There is no record evidence of domestic violence or intimate partner violence occurring at this time." *Id.* at 16. Father asserts that although Dr. O'Hara was concerned that Child could be exposed to IPV if returned to Father, "he could only express that in hypotheticals," and admitted he is unable to predict whether Child would be exposed to IPV. *Id.* at 15. Father also claims Dr. O'Hara also testified there was no evidence that Father was attempting to control Mother. Father further asserts that he has maintained employment, attended mental health treatment, and resides with Mother and two of their children at the Days Inn. He also argues he successfully displayed positive parenting skills at his supervised visits with Child. He argues he has a bond with Child, who refers to him as "dad." *Id.* at 16.

Father next argues OCYF failed to prove by clear and convincing evidence that termination would best serve Child's needs and welfare. He

stresses that he has had weekly supervised visits with Child, and that he testified to implementing some of the suggestions from the service provider. Father asserts Dr. O'Hara testified that Father displayed positive parenting skills. Father argues that although Child has resided with Foster Parents since birth, the record supports that she has a beneficial connection with Father.

We review these claims pursuant to the following standard. "We accept the findings of fact and credibility determinations of the trial court if the record supports them." *In re Adoption of K.C.*, 199 A.3d 470, 473 (Pa.Super. 2018). "If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of discretion." *Id.*

Termination of parental rights is controlled by Section 2511 of the Adoption Act. *See* 23 Pa.C.S.A. § 2511. This requires the court to engage in a bifurcated analysis. *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). The initial focus is on the conduct of the parent, as the party seeking termination must prove "that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *Id.* If the court finds grounds for termination exist under subsection (a), the court turns its focus to the "determination of the needs and welfare of the child under the standard of best interests of the child," as required by Section 2511(b). *Id.*

"A party seeking termination of parental rights bears the burden of establishing grounds for termination by clear and convincing evidence." *In re Adoption of K.C.*, 199 A.3d at 473 (internal quotation marks and citation omitted). "Clear and convincing evidence is evidence that is so clear, direct,

weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Id.* (internal quotation marks and citation omitted).

Regarding the initial inquiry into the conduct of the parent, the court found grounds for termination under Section 2511(a)(5) and (a)(8). We will discuss only the latter subsection. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (stating appellate court need only agree with trial court's decision as to any one subsection of 2511 to affirm the termination of parental rights).

Subsection 2511(a)(8) permits termination of parental rights where four conditions exist: (1) "[t]he child has been removed from the care of the parent by the court or under a voluntary agreement with an agency"; (2) "12 months or more have elapsed from the date of the removal or placement"; (3) "the conditions which led to the removal or placement of the child continue to exist"; and (4) "termination of parental rights would best serve the needs and welfare of the child." 23 Pa.C.S.A. § 2511(a)(8).

Under this subsection, if a child has been removed for 12 months, the court must determine whether the conditions that led to the child's removal or placement continue to exist, "despite the reasonable good faith efforts of [the agency] supplied over a realistic time period." *In re K.Z.S.*, 946 A.2d 753, 759 (Pa.Super. 2008); *accord In re R.A.M.N.*, 230 A.3d 423, 428 (Pa.Super. 2020). This subsection "does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially

- 10 -

caused placement or the availability or efficacy of [agency] services." *Id.* We "cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006).

Here, Child was removed from Mother's care at birth. CYS had already been involved with the parents for five years at that point, and Mother and Father faced criminal charges based on their gross mistreatment of Child's older sibling. After Child's removal, Mother and Father failed to take responsibility for how they had treated Child's sibling. Dr. O'Hara testified that the parents would have difficulty in making substantive changes to their parenting without addressing the cause of their failures. There have also been repeated reports of IPV throughout the case, and as recently as two months before the termination hearing. Mother and Father have minimized this issue and are now refusing to attend further services to eradicate the ongoing violence. Dr. O'Hara testified that the parents have not demonstrated a desire to fix this situation, and explained the risks it poses to Child. We therefore find the record contains clear and convincing evidence that the conditions that led to Child's removal—her parents' inability to protect her and provide her with a safe home—continue to exist.

Father's claim that the IPV has stopped is not supported by the record. Mother reported abuse as recently as of July 2023 – just two months before the hearing. *See* N.T. at 144-45. The possibility that Child would be exposed to IPV is more than hypothetical.

We therefore turn to Child's needs and welfare. *See* 23 Pa.C.S.A. § 2511(a)(8), (b). This analysis includes "intangibles such as love, comfort, security, and stability." *Int. of K.T.*, 296 A.3d 1085, 1106 (Pa. 2023) (citation omitted). "One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond." *In re L.M.*, 923 A.2d at 511. "[C]ourts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d 251, 268 (Pa. 2013).

Here, as the court observed, Child has never resided with Father and naturally shares a stronger bond with Foster Parents, where she has lived for her 3½ years of life. The trial court noted Child also lives with a sibling and described the foster home as "loving." *See* Findings of Fact at 10. The court also recognized Child's need for stability after 3½ years of placement. Further, as the court observed, returning Child to Father's care when there is ongoing IPV in the home would be dangerous for Child's physical and emotional well-being.

The record supports the court's conclusion that termination of Father's parental rights is in Child's best interests. We therefore affirm the order involuntarily terminating Father's parental rights.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


DATE: 07/29/2024